# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————

No. 13-20281

———————

United States Court of Appeals
Fifth Circuit

**FILED**

June 12, 2014

Lyle W. Cayce
Clerk

ANGELA LEA; DARREL LEA,

Plaintiffs – Appellants

v.

BUY DIRECT, L.L.C.,

Defendant – Appellee

———————

Appeal from the United States District Court
for the Southern District of Texas

———————

Before JOLLY, SMITH, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

Angela Lea and Darrel Lea brought this action seeking statutory damages under the Truth in Lending Act. They claim that Buy Direct, L.L.C., doing business as Direct Buy of Houston North, failed to provide the dates that payments would be due on an installment contract for membership in Direct Buy's wholesale membership club. The district court granted summary judgment to Direct Buy. We REVERSE and REMAND for entry of judgment in favor of the Leas.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 16, 2012, Angela and Darrel Lea attended an "Open House" event at the Direct Buy Houston North location. Direct Buy is a wholesale membership club which offers members the opportunity to purchase home

No. 13-20281

furnishings and electronics at wholesale prices through Direct Buy's vendor network. At the event, the Leas decided that they wished to join the Direct Buy membership club, at a cost of $3,995 for a three-year membership. Unable to make a required 10% down payment that day, the Leas agreed to pay $100 on May 16, and then $295 on June 5. The parties executed a Membership Agreement and a Retail Installment Contract, both post-dated June 5, 2012. On the form, the blanks for the "day of each month" the installment payments would be due and the "beginning" date of the Leas' payments were left blank, to be determined based upon the date the down payment was fully paid. The Leas and Direct Buy also executed a Payment Agreement, authorizing Direct Buy to charge the Leas' credit card for the $295 on June 5. At the Leas' request, this date was moved to June 8.

On June 8, Direct Buy attempted to charge the Leas' credit card for the $295, but the charge was declined. Pursuant to a provision in the Payment Agreement, on June 9, Direct Buy successfully charged the Leas' credit card for $100, leaving $195 of the down payment yet unpaid. On June 13, Direct Buy attempted to charge the Leas' card for the remaining $195, but the charge was declined. Finally, on June 21, Direct Buy successfully but erroneously charged the Leas' credit card for $295. Within the next 40 minutes, Direct Buy correctly refunded $100 to the Leas' credit card but then incorrectly refunded another $100. This meant that the Leas still had not paid the full $395 for the down payment. Also on June 21, the Leas attempted to cancel their Direct Buy membership in a telephone call to Direct Buy. On July 12, the Leas filed a chargeback request with their bank for the return of the $295 successfully charged to their credit card, citing the attempted cancellation from the June 21 telephone call. Direct Buy responded to the chargeback request from the Leas' bank with the Payment Agreement authorizing the charges and the Membership Agreement and Retail Installment Contract. Though the Leas'

2

No. 13-20281

bank resolved the matter in Direct Buy's favor, Direct Buy canceled the Leas' membership on August 8 in accordance with the Leas' request. On October 29, the Leas sued in the United States District Court for the Southern District of Texas. On November 30, after the Leas filed a complaint with the Office of the Texas Attorney General, Direct Buy issued a check for $295 to the Leas, fully refunding all payments on their membership.

The Leas' suit alleged one cause of action: that Direct Buy had violated the Truth in Lending Act ("TILA") and its implementing regulations by failing to include the starting date and subsequent monthly payment due dates. *See* 15 U.S.C. § 1638(a)(6); 12 C.F.R. § 1026.18(g). Direct Buy moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), which the district court later converted to a motion for summary judgment. The district court concluded that the contract was never "consummated" because the down payment was a condition precedent to the extension of credit, and the Leas never fully made their down payment. Thus, the district court concluded TILA did not apply and granted summary judgment in favor of Direct Buy. The Leas appeal.

## DISCUSSION

"We review a grant of summary judgment de novo, applying the same legal standards as do the district courts." *Vuncannon v. United States*, 711 F.3d 536, 538 (5th Cir. 2013). Summary judgment is proper when viewing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

Under TILA, "a creditor . . . shall disclose to the person who is obligated on a . . . consumer credit transaction the information required under this subchapter." 15 U.S.C. § 1631(a). For a "consumer credit transaction other than an open end credit plan, the creditor shall disclose . . . [t]he number, amount, and due dates or period of payments scheduled to repay the total of

3

payments." 15 U.S.C. § 1638(a)(6).  Successful plaintiffs may recover statutory damages against violators of TILA.  15 U.S.C. § 1640(a)(2)(A).  The disclosures required by TILA must be made "before consummation of the transaction."  12 C.F.R. § 226.17(b).  "Consummation means the time that a consumer becomes contractually obligated on a credit transaction."  12 C.F.R. 226.2(a)(13); *see also Davis v. Werne*, 673 F.2d 866, 869 (5th Cir. 1982).

Here, the Leas agreed on May 16, 2012, to make a down payment in two separate credit card charges, one that day and a second on June 5.  They also signed a Membership Agreement and Retail Installment Contract post-dated June 5.  We first determine whether an agreement for the extension of credit was "consummated" on May 16 when the Leas signed the Membership Agreement, Payment Agreement, and paid the first $100 of their down payment.  The district court analyzed the down payment as a condition precedent to the extension of credit.  That is, Direct Buy was not obligated to extend the agreed-upon credit to the Leas until they made the down payment.  Concluding that the Leas never fully paid the down payment, the district court reasoned that the condition precedent of the down payment was not met and the contract was never consummated.  We disagree.

Precedent on consummation of credit transactions for TILA is sparse.  Nonetheless, we find *Davis* instructive.  In *Davis*, a seller of storm doors and window guards entered into an installment sales contract with a consumer, with the consumer to pay for those fixtures over a 48-month period.  *Davis*, 673 F.2d at 868.  When the seller-creditor was unable to assign the credit agreement, the agreement was rescinded and the parties arranged financing through another lender.  *Id*.  The district court there had concluded that because the parties mutually rescinded the contract later, it must not have been consummated for TILA purposes.  *Id.* We rejected this conclusion, holding that "post-consummation abandonment of a financing agreement generally

will have no effect upon a creditor's TILA liability." *Id.* at 870.  This is because TILA "is a disclosure law" designed to protect consumers and does not implicate "the duty of subsequent performance" on the relevant contract or contracts. *Id.*

We conclude that even though the Leas canceled their Direct Buy membership and sought to rescind the contract for credit before they completed the down payment, the contract was consummated for the purposes of TILA. The agreement was consummated when the Leas signed the Membership Agreement, Retail Installment Contract, and Payment Agreement and paid the first $100 of their down payment.  That is when their obligations became fixed even though their performance was far from complete.  It is important that those obligations included the need to comply with terms for the extension of credit.  "Consummation does not occur when the consumer becomes contractually committed to a *sale* transaction, unless the consumer also becomes legally obligated to accept a particular *credit* arrangement."  12 C.F.R. § 226.2(a)(13), Supplement I, Subpart A (emphasis added).

In sum, a credit transaction occurred on May 16 when the Leas paid $100, agreed to pay the remaining $295, and signed the Membership Agreement and Retail Installment Contract.  To comply with its TILA duties, Direct Buy at that time was required to disclose a payment schedule, specifically, "[t]he number, amount, and due dates or period of payments scheduled to repay the total of payments."  15 U.S.C. § 1638(a)(6); *see also* 12 C.F.R. § 1026.18(g).  The contracts did not show the day of the month that payments were due or the beginning date of the installment payments.  They were intentionally left blank by Direct Buy, to be completed upon the receipt of the Leas' full down payment on an uncertain date.  Neither the Membership Agreement nor Retail Installment Contract contained any language showing when the installment payments were to commence or at what interval they

No. 13-20281

would be due.  *See* 15 U.S.C. § 1638(a)(6); 12 C.F.R. § 1026.18(g).  TILA is a private attorneys general statute enacted to "penalize noncomplying creditors and deter future violations."  *Davis*, 673 F.2d at 869.  Plaintiffs recover "even if they have not sustained any actual damages, or even if the creditors are guilty of only minute deviations from the requirements of TILA."  *Id.*

Here, Direct Buy's failure to include the starting date and interval, or, alternatively, the day of each month the Leas' installment payments would be due, is a technical violation.  Direct Buy's decision to leave the contract blanks unfilled was, at least in part, an accommodation to the Leas.  A sister circuit suggested "it is not necessary or appropriate to hold creditors absolutely liable for every non-compliance and to disregard completely the factual situation out of which the claim has arisen."  *Streit v. Fireside Chrysler-Plymouth, Inc.*, 697 F.2d 193, 196 (7th Cir. 1983).  "We believe that Congress would not have intended to impose liability on a creditor for a technical violation where [the transaction disintegrated] because of the consumer's complete failure to fulfill his obligations."  *Id.*  We acknowledge the equities but conclude that the statutory language is unqualified: a consumer is entitled to TILA disclosures prior to consummating a transaction.  We find no basis in the statute to vary the application of TILA's requirements due to equitable considerations.  Though we may see no harm here and find acquiescence by the consumer for whose protection the TILA requirement exists, we are compelled to apply TILA as written.  When the parties entered into this agreement on May 16, the Leas became contractually obligated to make the down payment and installment payments. Accordingly, they were entitled to and did not receive all required disclosures under TILA.

Perhaps our reversal falls into the category of letting no good deed go unpunished. Another perspective, though, is that TILA provides an unvarying set of rules that protect consumers who might otherwise voluntarily waive

No. 13-20281

what they should not.  We do not perceive any harm here, but harm is not a prerequisite for relief.  *See Davis*, 673 F.2d at 869.

Direct Buy failed to make the required disclosures to the Leas, who therefore are entitled to damages.  15 U.S.C. § 1640(a)(2)(A).  As Direct Buy is a "creditor who fail[ed] to comply with" the disclosure requirements of TILA, it shall be liable as described in that statute, despite that the Leas suffered no injury due to Direct Buy's failure to provide the required disclosures. 15 U.S.C. § 1640(a); (a)(2)(A)(i); *see Davis*, 673 F.2d at 869.  On remand, the district court shall determine the amount of damages, costs, and attorney's fees in accordance with the statute and enter judgment against Direct Buy for that amount.

REVERSED and REMANDED.